UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------X
KATOSH PANTOLIANO,

        *Petitioner*,

    v.

UNITED STATES OF AMERICA,

        *Respondent.*
---------------------------------X

**MEMORANDUM & ORDER**

13-cv-6417 (KAM)

**KIYO A. MATSUMOTO, United States District Judge**

On February 10, 2012, Senior United States District Judge Sterling Johnson, Jr. ("Judge Johnson") sentenced *pro se* petitioner Katosh Pantoliano ("Mr. Pantoliano") to 125 months in custody for conspiracy to commit Hobbs Act robbery, 18 U.S.C. § 1951(a), and brandishing a firearm in connection with a crime of violence, 18 U.S.C. § 924(c), to which Mr. Pantoliano had pleaded guilty pursuant to a plea agreement with the United States of America (the "Government").  Before the Court is Mr. Pantoliano's petition to vacate his sentence pursuant to 28 U.S.C. § 2255.  For the reasons set forth below, the Court finds that Mr. Pantoliano's arguments lack merit, and Mr. Pantoliano's petition is DENIED in its entirety.

## Background

In 2008, the New York City Police Department and the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") launched an investigation into a series of card game robberies

in the Eastern District of New York.  Through a cooperating witness, the investigative team learned that Mr. Pantoliano was part of a crew that carried out robberies of narcotics traffickers and illegal gambling establishments.  During certain robberies, the crew posed as police officers, brandished firearms, and used counterfeit police badges.  Several victims were physically restrained, threatened, or physically harmed.

## I.   The Indictment

Mr. Pantoliano faced a five-count indictment for his involvement in the aforementioned robberies.  (10-cr-68, ECF No. 84, Second Superseding Indictment.)  Counts One and Two charged Mr. Pantoliano with, respectively, a conspiracy to rob narcotics traffickers and gambling establishments between April 2008 and September 2008, and the use and brandishing of a firearm in connection with the robbery conspiracy.  (*Id.*)  Counts Three, Four, and Five charged Mr. Pantoliano with, respectively, a conspiracy to rob a restaurant employee on September 28, 2009, commission of the robbery, and the use, brandishing, and discharge of a firearm in connection with the robbery.  (*Id.*)

## II.  The Plea

Mr. Pantoliano, represented by Richard B. Lind, Esq. ("Mr. Lind"),[1] engaged in plea negotiations with the Government.

---

[1] Prior to Mr. Lind, Mr. Pantoliano was represented by Charles Samuel Hochbaum, Esq., and Michael Hurwitz, Esq.

On June 1, 2011, the Government conveyed a plea offer under which Mr. Pantoliano would plead guilty to Counts One and Two of the indictment and face an estimated advisory Guidelines range of 121 to 130 months in custody.  (Lind Aff. ¶ 10.)  Mr. Lind recalls Mr. Pantoliano as appearing pleased with the proposal.  (*Id.*)  Several days later, on June 6, 2011, Mr. Pantoliano emailed Mr. Lind that he "need[s] a 120 month (Binding-Plea) that will guarantee us the 120 months," and directed Mr. Lind "to tell [Judge Johnson] that if [the Government is] not willing to give us the 120 month binding plea that we want to 'move' to dismiss all the charges against me because [there] is no[t] sufficient evidence to support the elements of the crimes charged against me in counts one and two."  (*Id.* Ex. E.)

Also on June 6, 2011, the Government sent a revised plea agreement to Mr. Lind, stating that the initial agreement contained an incorrect Guidelines calculation.  (*Id.* ¶ 11; *id.* Ex. D.)  The revised plea agreement determined that Mr. Pantoliano qualified as a "career offender," subjecting him to an enhanced penalty under Guideline 4B1.1(c)(3) and an estimated advisory Guidelines range of 262 to 327 months in custody.  (*Id.* ¶¶ 11-12.)  Mr. Lind met with Mr. Pantoliano the next day, who "strongly objected" to the revised agreement.  (*Id.*)

Following the meeting, Mr. Lind researched and presented evidence as to why Mr. Pantoliano should not qualify

3

as a career offender and convinced the Government of the same.
(*Id.* ¶ 17.)  The Government then conveyed a further revised plea
agreement, which removed the career offender designation and set
forth an estimated Guidelines range of 114 to 121 months in
custody.  (*Id.* ¶ 18; *id.* Ex. F.)  After Mr. Pantoliano discussed
with Mr. Lind the elements of each offense and the strength of
the Government's evidence against him, specifically as to his
involvement in the conspiracy to rob gambling establishments,
Mr. Pantoliano decided to plead guilty.  (*Id.* ¶ 19.)

On June 15, 2011, Mr. Pantoliano entered into the
revised plea agreement with the Government, admitting he was
guilty of conspiracy to commit Hobbs Act robbery, in violation
of 18 U.S.C. § 1951(a) (Count One), and brandishing a firearm in
connection with a crime of violence, in violation of 18 U.S.C. §
924(c)(1)(A)(ii) (Count Two).  (ECF No. 10, Response to Order to
Show Cause, Ex. A, Plea Agreement ("Plea Ag."), ¶ 1.)  As noted
above, the plea agreement stated that Mr. Pantoliano faced an
estimated Guidelines range of 114 to 121 months in custody.
(*Id.* ¶ 2.)  By signing the plea agreement, Mr. Pantoliano
"agree[d] not to file an appeal or otherwise challenge, by
petition pursuant to 28 U.S.C. § 2255 or any other provision,
the conviction or sentence in the event that the Court impose[d]
a term of imprisonment of 125 months or below."  (*Id.* ¶ 4.)  Mr.
Pantoliano signed immediately under the paragraph stating, "I

4

have read the entire agreement and discussed it with my attorney.  I understand all of its terms and am entering into it knowingly and voluntarily."  (*Id.* ¶ 7.)

Mr. Pantoliano appeared for a plea hearing before Judge Johnson the same day he entered into a plea agreement. (ECF No. 1, Petition ("Pet."), Ex. A, Transcript of June 15, 2011 Plea Hearing ("Plea Tr.").)  Mr. Pantoliano represented in court that he had received a copy of the indictment and understood the charges pending against him, which he had discussed with his attorney, and that he was fully satisfied with Mr. Lind's advice, representation, and counsel.  (*Id.* at 04:04-13, 14:06-24.)  Mr. Pantoliano represented that he had signed the plea agreement, that his plea was voluntary and knowing, and that no one made any promises to him about the sentence he would receive.  (*Id.* at 04:21-05:02, 15:09-23.)

Turning to the substance of the plea agreement, Mr. Pantoliano acknowledged under oath to Judge Johnson that, as set forth in the agreement, he faced an estimated advisory Guidelines sentencing range of 33 to 41 months' imprisonment on Count One (*id.* at 07:20-08:04) and a consecutive seven-year mandatory minimum sentence on Count Two (*id.* at 08:05-09), leading to a total effective estimated Guidelines range of 114 to 121 months (*id.* at 08:10-16).  Mr. Pantoliano further represented that he understood that by entering into the plea

agreement, he waived his right to "appeal or otherwise challenge, by 2255 or any other provision, [his] conviction or sentence in the event that the Court impose[d] a sentence of imprisonment of 125 months or below." (*Id.* at 08:17-23.)

After Mr. Pantoliano allocuted to his conduct in connection with Counts One and Two, the Court found: "that the defendant is fully competent and capable of entering an informed plea; [t]hat the defendant is aware of the nature of the charges and the consequences of his plea, and [t]hat his plea of guilty is knowing and is voluntary, and; [s]upported by an independent basis in fact containing each of the essential elements of the offense." (*Id.* at 15:24-16:09.)   Judge Johnson then accepted Mr. Pantoliano's plea of guilty to Counts One and Two of the Second Superseding Indictment.

### III. The Sentence

The Probation Department prepared a Pre-Sentence Investigation Report ("PSR") in advance of sentencing.   (Lind Aff. ¶ 22.)   The PSR calculated a higher estimated Guidelines range than the plea agreement to which Mr. Pantoliano pleaded guilty.   (*Id.*; *see also* ECF No. 10, Response to Order to Show Cause ("Opp."), at 4 (stating that the PSR set forth an estimated effective Guidelines range of 162 to 181 months).)   Mr. Pantoliano, in what had become a pattern, filed a letter making various allegations of misconduct against Mr. Lind,

6

including that Mr. Lind "misled, coerced, manipulated, misadvised, and convinced" him to sign the plea agreement, which set forth an estimated Guidelines range of 114 to 121 months, despite "knowing" that Mr. Pantoliano would receive a higher sentence.  (Lind Aff., Ex. G.)  Mr. Pantoliano asked that Judge Johnson (1) discharge Mr. Lind and appoint a new attorney and (2) allow Mr. Pantoliano to withdraw his guilty plea.  (*Id.*) Shortly thereafter, Mr. Lind submitted a letter indicating that, due to Mr. Pantoliano's baseless allegations, a conflict now existed with his client and asking to withdraw as counsel. (Lind Aff., Ex. F.)

Judge Johnson granted Mr. Lind's request to withdraw and appointed Philip Katowitz, Esq. ("Mr. Katowitz") to represent Mr. Pantoliano at sentencing.  (ECF Dkt. Order, Oct. 20, 2011.) In appointing Mr. Katowitz, Mr. Pantoliano's fourth CJA lawyer, Judge Johnson "admonished [Mr. Pantoliano] that CJA counsel is assigned for purposes of sentencing.  Should [Mr. Pantoliano] be dissatisfied with new counsel, he will proceed *pro se* and counsel will remain to advise." (*Id.*)  Shortly thereafter, Mr. Pantoliano wrote Judge Johnson alleging a conflict with Mr. Katowitz and asking that Judge Johnson remove Mr. Katowitz, stating that "[he] [was] willing to proceed 'pro se' for sentencing because [his] attorney fail[ed] to ethically

follow [his] instructions."  (ECF No. 145, Letter from Mr. Pantoliano.)

On January 27, 2012, Mr. Pantoliano appeared before Judge Johnson for sentencing.  (Pet., Ex. E, Transcript of January 27, 2012 Sentencing ("Sent. Tr.").)  Judge Johnson began by addressing Mr. Pantoliano's request to discharge Mr. Katowitz.  (*Id.* at 02:15-19.)  Judge Johnson stated that "the last time [he] spoke to Mr. Pantoliano," he advised him that if Mr. Pantoliano "didn't accept [Mr. Katowitz as his attorney], that [Mr. Pantoliano] was going to proceed *pro se*."  (*Id.*) After Mr. Pantoliano confirmed he wished to represent himself, Judge Johnson relieved Mr. Katowitz and granted Mr. Pantoliano's request to represent himself at sentencing.  (*Id.* at 04:01-12.)[2] Judge Johnson next denied Mr. Pantoliano's motion to withdraw his plea, because Judge Johnson had conducted the plea and found that Mr. Pantoliano understood the nature of the charges against him and the consequences of his actions.  (*Id.* at 04:19-25.)

Judge Johnson proceeded with sentencing, and inquired whether either party had outstanding objections to the PSR.  Mr. Pantoliano raised some objections but claimed that he required

---

[2] Judge Johnson initially directed Mr. Katowitz to remain present to advise Mr. Pantoliano, in the event he required any assistance. (Sent. Tr. at 04:01-12.)  Mr. Katowitz stated that Mr. Pantoliano had raised a grievance against him, and inquired as to whether it would be appropriate to remain to advise his former client in light of the filing.  (*Id.* at 07:07-16.)  Judge Johnson then relieved Mr. Katowitz entirely.  (*Id.* at 07:17-08:14.)

his "case file" to raise additional matters with the court.
(*Id.* at 12:01-13:01.)   Having disposed of Mr. Pantoliano's
objections to the PSR, Judge Johnson turned to imposition of the
sentence.   Judge Johnson initially imposed a sentence of 97
months on Count One and 84 months on Count Two, for a total of
181 months.   (*Id.* at 13:13-20.)   Mr. Pantoliano, however,
objected to the sentence and reminded Judge Johnson that the
plea agreement allowed him to appeal a sentence above 125
months.   (*Id.* at 14:14-16.)   As a result, Judge Johnson reduced
Mr. Pantoliano's sentence to 41 months on Count One and 84
months on Count Two, for a total sentence of 125 months.   (*Id.*
at 16:07-17.)   The Government then dismissed the remaining
counts and the underlying indictment (*id.* at 14:04-12), and the
court entered judgment convicting Mr. Pantoliano of conspiracy
to commit Hobbs Act robbery (Count One) and unlawful use of a
weapon in connection with a crime of violence (Count Two).

### Procedural History

On February 10, 2012, Mr. Pantoliano filed an appeal
with the United States Court of Appeals for the Second Circuit.
(*See* ECF No. 168, Notice of Appeal.)   Mr. Pantoliano argued that
his sentence and conviction should be vacated because the
district court lacked subject matter jurisdiction.   The
Government moved to dismiss Mr. Pantoliano's appeal as
procedurally barred by the waiver of appellate rights in his

plea agreement. *U.S. v. Pantoliano*, No. 12-577 (2d Cir.) (ECF
No. 30, Motion to Dismiss).  The Second Circuit found that Mr.
Pantoliano "ha[d] not demonstrated that the waiver of his
appellate rights [was] unenforceable under *United States v.
Gomez-Perez*, 215 F.3d 315, 319 (2d Cir. 2000)," and granted the
Government's motion to dismiss Mr. Pantoliano's appeal. *U.S. v.
Pantoliano*, No. 12-577 (2d Cir.) (ECF No. 77, Motion Order.)

On November 14, 2013, Mr. Pantoliano filed the instant
petition for habeas relief pursuant to 28 U.S.C. § 2255.  (ECF
No. 1, Petition.)  Mr. Pantoliano argued that his conviction and
sentence were unconstitutional for four reasons: (1) his guilty
plea was not knowing and voluntary because it was the product of
ineffective assistance of counsel at pleading; (2) his
conviction was unconstitutional because Respondents had a
financial interest in his conviction; (3) the court lacked
subject matter jurisdiction because Brooklyn and Staten Island
were not ceded to the United States at the time the offense was
committed; and (4) he received ineffective assistance of counsel
at sentencing.  (*See generally id.*)

On January 2, 2014, on the court's order, Mr. Lind
filed an affirmation responding to Mr. Pantoliano's allegation
that he received ineffective assistance of counsel in deciding
to plead guilty to Counts One and Two of the indictment.  (Lind
Aff.)  Mr. Pantoliano responded to Mr. Lind's affidavit, which,

as the court explains below, raised the same conclusory assertions in his subsequent petition for habeas relief. (ECF No. 9, Response to Lind Aff.)  On April 3, 2014, the Government filed its opposition to Mr. Pantoliano's petition for habeas relief. (ECF No. 10, Government's Opposition to Petition ("Opp.").)  Mr. Pantoliano filed a reply on May 6, 2014. (ECF No. 20, Reply in Support of Pet.)

On May 24, 2016, Mr. Pantoliano moved to supplement his petition to raise a challenge to his § 924(c) conviction pursuant to *Johnson v. United States*, 135 S. Ct. 2551 (2015). (ECF No. 24, Motion for Leave to Amend.)  The court granted Mr. Pantoliano's request. (ECF Dkt. Entry, June 22, 2016.)  On August 19, 2016, the Government submitted its response to Mr. Pantoliano's supplemental petition raising the *Johnson* claim. (ECF No. 32, Government Response to Supplemental Petition.)

On June 14, 2017, Mark Goidell, Esq., appointed by the court to assist Mr. Pantoliano in litigating his habeas petition, filed a memorandum in further support of Mr. Pantoliano's petition, which addressed only the fourth ground for relief – ineffective assistance of counsel at sentencing. (ECF No. 39, Supplemental Reply in Support of Petition.)  The Government filed a supplemental opposition. (ECF No. 41, Opposition to Supplemental Reply.)

## Standard of Review

"A prisoner in custody under sentence of a [federal court] claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, . . . or is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence."  28 U.S.C. § 2255(a).  The Court "shall vacate and set the judgment aside" if the Court finds that "there has been such a denial or infringement of the constitutional rights of the prisoner as to render the judgment vulnerable to collateral attack."  *Id.* § 2255(b).  To respect the finality of criminal convictions, "a collateral attack on a final judgment in a federal criminal case is generally available under § 2255 only for a constitutional error, a lack of jurisdiction in the sentencing court, or an error of law or fact that constitutes a 'fundamental defect which inherently results in a complete miscarriage of justice.'" *United States v. Bokun*, 73 F.3d 8, 12 (2d Cir. 1995) (quoting *Hill v. United States*, 368 U.S. 424, 428 (1962)).

## Discussion

Mr. Pantoliano moves for relief pursuant to § 2255 on the grounds that: (1) his guilty plea was not knowing and voluntary because he received ineffective assistance of counsel

12

at pleading; (2) his conviction is unconstitutional because respondents had a financial interest in his conviction; (3) the court lacked subject matter jurisdiction over the charges against him; (4) he received ineffective assistance of counsel at sentencing; and (5) his § 924(c) conviction is unconstitutional. (*See* generally Pet.)  Mr. Pantoliano agreed to waive his right to collaterally attack his conviction and sentence in the event Judge Johnson imposed a sentence of 125 months or less, as occurred here.  The only ground not precluded by this waiver is the argument that Mr. Pantoliano's plea agreement was not knowing and voluntary due to ineffective assistance of counsel at the pleading stage.  For the reasons explained herein, the court finds that counsel effectively assisted Mr. Pantoliano in connection with his plea, Mr. Pantoliano's waiver of his collateral attack rights was knowing and voluntary, the plea agreement and waiver of collateral attack rights remain valid, and the remainder of Mr. Pantoliano's claims are procedurally barred.

## I.   Preliminary Considerations

The court begins its discussion by addressing (1) whether the collateral attack waiver in Mr. Pantoliano's plea agreement bars the instant petition and (2) whether the court may decide the instant petition on the record before the court, or whether an evidentiary hearing is necessary.

a. Waiver

The threshold question in this action is whether Mr. Pantoliano's collateral attack waiver bars the instant petition. "A defendant's knowing and voluntary waiver of the right to . . . collaterally attack his conviction and/or sentence is enforceable." *See Sanford v. United States*, 841 F.3d 578, 580 (2d Cir. 2016). A waiver is knowing if the "defendant fully understood the potential consequences of his waiver." *United States v. Monzon*, 359 F.3d 110, 116 (2d Cir. 2004). "[E]xceptions to the presumption of the enforceability of a waiver . . . occupy a very circumscribed area of [this Circuit's] jurisprudence." *Sanford*, 841 F.3d at 580.

Mr. Pantoliano "agree[d] not to . . . challenge, by petition pursuant to 28 U.S.C. § 2255 . . . [his] conviction or sentence in the event that the Court impose[d] a term of imprisonment of 125 months or below." (Plea Ag. ¶ 4.) In signing the agreement, Mr. Pantoliano represented that he had "read the entire agreement and discussed it with [his] attorney" and "underst[ood] all of its terms and [was] entering into it knowingly and voluntarily." (*Id.* at 7.) Mr. Pantoliano also represented under oath in court that he understood the waiver provision of the plea agreement, and had not been induced or threatened in any way to enter into the plea agreement. (Plea Tr. at 04:21-05:02, 15:09-23.) *See United States v. Hernandez*,

242 F.3d 110, 112 (2d Cir. 2001) (courts may rely on the defendant's sworn statements, made in open court, that he understood that he was waiving his right to appeal a sentence below the stipulated maximum).  Because Judge Johnson sentenced Mr. Pantoliano to 125 months in custody, Mr. Pantoliano is procedurally barred from bringing this action.

There is, however, one potentially applicable exception: A waiver is not enforceable if it "was not made knowingly, voluntarily, and competently."  *Gomez–Perez*, 215 F.3d at 319.  Mr. Pantoliano argues that his waiver was not made knowingly and voluntarily as it was a product of ineffective assistance of counsel at pleading, a claim not barred by the waiver because it serves as an attack on the constitutionality of the process by which Mr. Pantoliano waived his rights.  *See, e.g.*, *United States v. Djelevic*, 161 F.3d 104, 106–07 (2d Cir. 1998).  If Mr. Pantoliano establishes that, due to ineffective assistance of counsel, the waiver in his plea agreement was not knowing and voluntary, the waiver will not be enforceable.  *United States v. Lloyd*, 901 F.3d 111, 124 (2d Cir. 2018).  If he fails to do so, Mr. Pantoliano's remaining claims will be barred.  The court will, therefore, begin its analysis with this threshold issue, before turning to Mr. Pantoliano's remaining challenges.

b. Evidentiary Hearing

The other question the court must address before considering the merits of Mr. Pantoliano's petition is whether the court can address the instant petition on the submitted record before the court, or whether Mr. Pantoliano's request for an evidentiary hearing should be granted. "In ruling on a motion under § 2255, the district court is required to hold a hearing '[u]nless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief.'" *Gonzalez*, 722 F.3d at 130 (quoting 28 U.S.C. § 2255). "[T]he filing of a motion pursuant to § 2255 does not automatically entitle the movant to a hearing." *Id.* No hearing is necessary "where the allegations are 'vague, conclusory, or palpably incredible.'" *Id.* (quoting *Machibroda 131 v. United States*, 368 U.S. 487, 495 (1962)). A hearing is necessary only where the petition "set[s] forth specific facts supported by competent evidence, raising detailed and controverted issues of fact that, if proved at a hearing, would entitle [the movant] to relief." *Id.*

Even if a hearing is warranted, it is "within the district court's discretion to determine the scope and nature of a hearing." *Raysor v. United States*, 647 F.3d 491, 494 (2d Cir. 2011) (citing *Chang v. United States*, 250 F.3d 79, 85–86 (2d Cir. 2001)). A full-blown hearing is not necessary in all

cases. *Puglisi v. United States*, 586 F.3d 209, 214–15 (2d Cir. 2009)). Courts frequently "consider the 'trial record, letters, documents, exhibits, affidavits and written interrogatories' and may adopt a 'middle road' approach, declining to hold a hearing and 'deciding disputed facts on the basis of written submissions.'" *Rosario v. United States*, No. 17-CR-0027 (LTS), 2019 WL 5260784, at *3 (S.D.N.Y. Oct. 17, 2019) (quoting *Pham v. United States*, 317 F.3d 178, 184 (2d Cir. 2003)); *see also Wang v. United States*, 458 F. App'x 44, 45 (2d Cir. 2012) (summary order) ("[T]he District Court did conduct an evidentiary hearing, albeit one limited to the sworn, written submissions of [petitioner], his former counsel, and the interpreters.").

In this action, the court adopted a "middle road" approach and directed Mr. Lind to respond to Mr. Pantoliano's allegations of ineffective assistance of counsel in connection with his plea. Mr. Lind filed a thorough, detailed, and credible 12-page affidavit, attaching 8 supporting exhibits, contradicting Mr. Pantoliano's assertions that he provided ineffective assistance in advising Mr. Pantoliano as to whether he should plead guilty. Mr. Pantoliano's response to Mr. Lind's affidavit does nothing more than offer the conclusory assertions contained in his petition. The court finds a full-blown evidentiary hearing unnecessary, as it would add "little to nothing" to the Court's determination of the instant petition,

particularly as both matters for which Mr. Pantoliano seeks a hearing – the nature of his guilty plea and *Faretta* claim – can be appropriately addressed on the record presently before the court. *Beckford v. United States*, No. 13-CV-2208 (DLI), 2017 WL 4286615, at *3 (E.D.N.Y. Sept. 26, 2017) (quoting *Chang*, 250 F.3d at 86).[3]

## II.  Grounds for Relief

For the reasons that follow, the court finds that Mr. Pantoliano's plea was knowing and voluntary, and that the collateral attack waiver in his plea agreement remains valid. As a result, Mr. Pantoliano's remaining claims are procedurally barred and his petition must be denied.

### A. Ground One: Ineffective Assistance of Counsel at Pleading

Mr. Pantoliano argues that Mr. Lind provided ineffective assistance at pleading, rendering his agreement to plead guilty unknowing and involuntary and invalidating the plea agreement and plea in their entirety.  This argument is unavailing.

---

[3] Mr. Pantoliano also requests discovery of certain information relating to his claim that Respondents have a financial interest in his conviction.  (*See* Pet. at 41-42.)  Mr. Pantoliano "is not entitled to discovery as a matter of ordinary course," *Bracy v. Gramley*, 520 U.S. 899, 904 (1997), and has failed to show good cause for discovery, *Drake v. Portuondo*, 321 F.3d 338, 346 (2d Cir. 2003).  Mr. Pantoliano's assertions do not "show reason to believe that [he] may, if the facts are fully developed, be able to demonstrate that he is . . . entitled to relief,'" *Ferranti v. United States*, 480 F. App'x 634, 638 (2d Cir. 2012) (summary order) (quoting *Bracy*, 520 U.S. at 908-09), as his claims, particularly the financial interest claim for which he seeks discovery, lack merit.  The request for discovery is therefore denied.

1. *Legal Standard*

A petitioner must meet the "highly demanding" standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984), to prevail on a claim of ineffective assistance of counsel. *Kimmelman v. Morrison*, 477 U.S. 365, 382 (1986).  Under *Strickland*, a petitioner must show: (1) that defense counsel's performance was objectively unreasonable (the "performance prong"); and (2) that defense counsel's deficient performance prejudiced the defense (the "prejudice prong").  *Kovacs v. United States*, 744 F.3d 44, 49 (2d Cir. 2014) (citing *Strickland*, 466 U.S. at 687-88); *see also Parker v. Ercole*, 666 F.3d 830, 834 (2d Cir. 2012) (court need not address both prongs if a petitioner makes an insufficient showing on one).

"The performance component of the *Strickland* test asks whether a 'counsel's representation fell below an objective standard of reasonableness.'"  *Kovacs*, 744 F.3d at 50 (quoting *Strickland*, 466 U.S. at 688).  Courts "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance."  *Strickland*, 466 U.S. at 689.  They examine the reasonableness of counsel's actions, keeping in mind that "[c]onstitutionally effective counsel embraces a 'wide range of professionally competent assistance,' and 'counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of

reasonable professional judgment.'" *Greiner v. Wells*, 417 F.3d 305, 319 (2d Cir. 2005) (quoting *Strickland*, 466 U.S. at 690).

The prejudice component of the *Strickland* test asks whether "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* Merely showing that counsel's errors had "some conceivable effect" on the outcome is not enough to satisfy the prejudice prong, but "a defendant need not show that counsel's deficient conduct more likely than not altered the outcome in the case." *Id.* at 693.

### 2. *Application*

The crux of Mr. Pantoliano's argument is that Mr. Lind failed to properly explain the proof necessary to satisfy the interstate commerce element of the Hobbs Act, and as a result, he was unaware of a defense which he otherwise would have litigated at trial, rather than pleading guilty. (*See* Pet. at 4.) This argument lacks merit.

### a. Performance Prong

Mr. Pantoliano argues that Mr. Lind's performance was lacking because he did not explain the interstate commerce element of the Hobbs Act. (Pet. at 18.) Specifically, Mr. Lind allegedly failed to advise his client that *if* the type of drugs

that he and others conspired to rob was marijuana grown in New York, he *might* have had a jurisdictional defense under *United States v. Needham*, 604 F.3d 673 (2d Cir. 2010) (explaining that the Hobbs Act's interstate commerce element is not necessarily satisfied where a robbery targets marijuana, as marijuana can be grown, processed, and sold entirely within one state). Although a petitioner can bring an ineffective assistance of counsel claim based on the argument that defense counsel failed to apprise him of the elements of a crime, *see United States v. Weeks*, 653 F.3d 1188, 1201 (10th Cir. 2011), or a potential defense, *see Hill v. Lockhart*, 474 U.S. 52, 59 (1985), the record shows that Mr. Lind was not ineffective in this regard.

*First*, Mr. Pantoliano's argument relies entirely on his conclusory assertions and finds no support in the record. Mr. Pantoliano cites no evidence that he did not understand the nature of the interstate commerce element. Instead, Mr. Pantoliano cites the *absence* of statements in the plea transcript that he understood the elements of Count One, that he had discussed them with his attorney, or that he had discussed the plea agreement with his attorney. (*Id.* at 19-20.) Although the absence of evidence, in certain contexts, may be persuasive, it is not persuasive in this context as other evidence in the record clearly contradicts Mr. Pantoliano's assertions.

The record establishes that Mr. Pantoliano reviewed the indictment and charges against him with Mr. Lind. (Plea Tr. at 04:04-13 (confirming that Mr. Pantoliano reviewed the indictment and charges against him and discussed them with Mr. Lind).) The record further establishes that Mr. Pantoliano understood the plea agreement's terms, as evidenced by his representation in signing the plea agreement that he had reviewed and discussed the agreement with Mr. Lind. (Plea Ag. at 7.)

Furthermore, Mr. Pantoliano's assertions are contradicted by Mr. Lind's highly detailed and specific statements, which were derived in part from his review of contemporaneous records, namely, CJA vouchers submitted in connection with Mr. Lind's representation of Mr. Pantoliano. According to Mr. Lind's affidavit, on May 3, 2011, Mr. Lind met with Mr. Pantoliano for over two hours at the MDC to review his case. (Lind Aff. ¶ 7.) Mr. Lind "went over with [Mr.] Pantoliano the charges in the Indictment, and the nature and strength of the government's proof." (*Id.*) On June 14, 2011, after Mr. Lind secured the final revised plea agreement, Mr. Lind met with his client to review its terms:

> [Mr. Lind's] recollection is that, for once, [Mr. Pantoliano] was enthusiastic about [his] performance. As is [Mr. Lind's] practice, [he] prepared [Mr.] Pantoliano for his guilty plea, and went over the elements of both crimes with [Mr.] Pantoliano, as [Mr. Pantoliano] had

demanded on prior occasions, and particularly the strength
of the evidence as to [Mr.] Pantoliano's involvement in the
conspiracy to rob gambling establishments.

(*Id.* ¶ 19.)  By contrast, Mr. Pantoliano's response merely

alleges that Mr. Lind "disregarded" his contentions and, rather

than coming forward with competent proof contradicting Mr.

Lind's affirmation, simply reiterates the absence of statements

in the plea colloquy that Mr. Pantoliano understood the elements

of the charges against him.[4]

    *Second*, the court cannot find that Mr. Lind would have

been ineffective for not raising a potential jurisdictional

defense under *Needham* with his client.  As the court addresses

in more detail below, Mr. Pantoliano proffers no evidence that a

jurisdictional defect existed in this case.  As the Government

points out, Mr. Pantoliano does not present evidence that the

proceeds of the narcotics traffickers who were robbed in this

case were, in fact, proceeds from marijuana that was grown in

New York.  (Opp. at 9 n.2.)  Granting Mr. Lind's conduct the

---

[4] In response to Mr. Lind's affidavit, which indicated that the Government's
proffer as to jurisdiction relied primarily on Mr. Pantoliano's involvement
in card game robberies, Mr. Pantoliano alleges that Mr. Lind was ineffective
for allegedly telling Mr. Pantoliano that "the strength of the case against
[him] was regarding robberies of Drug Dealers." (Response to Lind Aff. at
3.)  Mr. Pantoliano then asserts that, if Mr. Lind had properly explained
that Mr. Pantoliano "was really only being charged with robbing illegal
gambling establishments, [he] would have rejected the plea based on the fact
that no injured parties exist regarding such robberies." (*Id.*)  Whether this
claim, if true, prejudiced Mr. Pantoliano is addressed below.  It is
sufficient for now to note that even if Mr. Pantoliano's discussion with Mr.
Lind focused on robberies of card games, Mr. Pantoliano was charged with, and
allocuted to, committing robberies of narcotics traffickers *and* illegal
gambling establishments.

appropriate deference, and without any evidence that a *Needham*
(or, indeed, any other defense) stood a chance of success at
trial, the court cannot find that Mr. Lind was ineffective in
failing to raise the prospect of a *Needham* defense with his
client.  Mr. Lind appropriately focused his efforts on securing
the most favorable plea deal for his client.

### b. Prejudice Prong

Even if Mr. Lind's performance was deficient, Mr.
Pantoliano cannot establish prejudice.  In the plea context, the
prejudice prong "focuses on whether counsel's constitutionally
ineffective performance affected the outcome of the plea
process." *Hill*, 474 U.S. at 59.  A petitioner can show
prejudice by "demonstrating a reasonable probability that, but
for counsel's errors, he would not have pleaded guilty and would
have insisted on going to trial." *Lee v. United States*, 137 S.
Ct. 1958, 1965 (2017).  The petitioner "must convince the court
that a decision to reject the plea bargain would have been
rational under the circumstances." *Padilla v. Kentucky*, 559
U.S. 356, 372 (2010).

The court must consider "all relevant factors"[5] in
determining whether the petitioner was prejudiced, *Gonzalez*, 722

---

[5] "[T]he fact that an attempt was made to withdraw [a] guilty plea and go to
trial may not be dispositive on the issue of IAC prejudice; however, it is a
factor that must be considered by the court in assessing whether there is a
reasonable probability that but for substandard performance by counsel, the

F.3d at 132, including whether: (1) the defendant knew "that the advice on which he claims to have relied might be incorrect"; (2) pleading guilty led to more lenient sentencing; (3) "the defendant advanced any basis for doubting the strength of the government's case against him;" or (4) the Government could have prosecuted the defendant on additional counts. *Chhabra v. United States*, 720 F.3d 395, 408 (2d Cir. 2013).

"In determining whether a petitioner has made the requisite showing, '[c]onclusory allegations that [the petitioner] would have insisted on proceeding to trial are generally insufficient to establish actual prejudice under *Strickland*.'" *Francis v. United States*, No. 12-CV-1362 (AJN), 2013 U.S. Dist. LEXIS 25470, at *12 (S.D.N.Y. Feb. 25, 2013) (quoting *Scott v. Superintendent*, No. 03-CV-06383, 2006 WL 3095760, *9 (E.D.N.Y. Oct. 31, 2006)). The Second Circuit requires "some objective evidence other than the petitioner's assertions to establish prejudice." *Pham*, 317 F.3d at 182 (finding "objective" evidence of prejudice resulting from

---

defendant would have chosen to eschew the plea and go to trial." *Gonzalez*, 722 F.3d at 133. Mr. Pantoliano moved to withdraw his guilty plea not based on the discovery of a potential jurisdictional defense, the ineffective assistance alleged here, but upon reviewing the PSR and learning that it contained a Guidelines range greater than that set forth in the plea agreement. (*See* ECF No. 130, Mot. to Withdraw Guilty Plea.) Yet, the plea agreement indicated that the Guidelines analysis was not binding on the Government, the Probation Department, or the court, a fact Mr. Pantoliano indicated he understood by signing the plea agreement. (*See* Plea Ag. at 3, 7.) Mr. Pantoliano's attempt to withdraw his plea is, therefore, not conclusive as to prejudice in the context of this action.

alleged failure to convey plea offer to include "the undisputed
sentencing disparity of at least 113 months between the high end
of the government's [allegedly unconveyed] plea offer and [the
petitioner's] sentence after a trial conviction"); *see also*
*Zhang v. United States*, 543 F. Supp. 2d 175, 185 (E.D.N.Y.
2008).

   *First*, the court must consider the viability of Mr.
Pantoliano's proposed defense.  Where a petitioner's specific
claim is that counsel failed to inform him of a potential
defense, the relevant inquiry is whether the defense "was viable
and sufficiently promising that [the petitioner] would have
litigated the defense to avoid [the plea] consequences."
*Kovacs*, 744 F.3d at 53.  Mr. Pantoliano's purported defense
falls short.  The Hobbs Act's interstate commerce element is
satisfied by a showing of the *possibility* or *potential* of an
effect on interstate commerce; an actual effect need not be
shown.  *See United States v. Jones*, 30 F.3d 276, 285 (2d Cir.
1994).

   Mr. Pantoliano posits that *if* the proceeds of the
narcotics traffickers he robbed resulted from marijuana grown in
New York, he *might* have had a defense under *Needham.*  (Pet. at
19.)  It is correct that the interstate commerce element is not
necessarily satisfied where a defendant is charged with stealing
marijuana, as marijuana "may be entirely grown, processed, and

sold in-state." *Needham*, 604 F.3d at 685.  But Mr. Pantoliano

cites no evidence from which the court could conclude that

*Needham* would, in fact, provide him with a defense in this

action – his argument is merely speculative.  Moreover, as Mr.

Lind indicates, the Government's proffer focused on Mr.

Pantoliano's involvement in robberies of illegal card games, and

Mr. Pantoliano makes nothing more than a conclusory argument the

Government would not be able to establish jurisdiction through

this aspect of the offense.[6]  Without any facts indicating that

there was any jurisdictional defect, or that any potential

defense would have been viable in any way, the court cannot find

that Mr. Pantoliano has established a "'reasonable probability'

---

[6] Mr. Lind's affidavit notes that the Government's proffer at the plea hearing
focused on Mr. Pantoliano's robbery of the *proceeds* of illegal card games,
not on the robbery of *narcotics* themselves, and that the Government could
have satisfied the Hobbs Act's interstate commerce element based on Mr.
Pantoliano's robbery of said gambling proceeds.  (Lind Aff. at 9.)  Mr.
Pantoliano reads Mr. Lind's affidavit as stating he was charged only with
robbing card games and states that, had he known this was the case, he would
not have pleaded guilty because "later case agents went to investigate the
alleged crimes in which no injured parties or people existed," so "it appears
that [he] pleaded guilty to robbing gambling establishments and people who do
not exist."  (ECF No. 9, Response to Lind Aff., at 5.)  Mr. Pantoliano's
cited evidence for this assertion comes from one paragraph of the PSR, which
reads:

> Although [Mr. Pantoliano] is liable for restitution to the victims of
> the robberies that occurred within the dates of the indictment, from
> April 2008 through September 2008, the case agent advises that the
> victims have been uncooperative and do not wish to be contacted by the
> Probation Office.

(*Id.* Ex. 1.)  Mr. Pantoliano's assertion clearly relies on a misreading of
the PSR, and he cites no other evidence to support the proposition that there
were no victims.  This argument is, consequently, similarly unavailing, and
this defense is not viable.

that advising [him] of the existence of the affirmative defense would have produced a result more favorable to him." *Mitchell v. Scully*, 746 F.2d 951, 955 (2d Cir. 1984).

*Second*, the evidence contradicts Mr. Pantoliano's conclusory assertion that, barring Mr. Lind's allegedly ineffective assistance, he would not have accepted the plea deal. Mr. Pantoliano played an active role in negotiating his plea deal. Mr. Pantoliano demanded an agreement which would guarantee him a 120-month term of imprisonment. If the Government did not offer such an agreement, Mr. Pantoliano was prepared to move to dismiss all counts for lack of evidence as to the elements of each offense, indicating his awareness that moving to dismiss the charges was a possibility. In the end, Mr. Pantoliano received a plea offer setting forth an estimated Guidelines range of 114 to 121 months in custody, all but satisfying his request for a 120-month term of custody. Mr. Pantoliano's conclusory assertions that he would have rejected this deal, which met his demands, and proceeded to trial on the basis of the *possibility* of a defense – which, from the facts, bore no viability – are unavailing and unsupported by evidence.

*Finally*, evaluation of the record as a whole does not support the position that it would have been rational for Mr. Pantoliano to reject the plea deal and proceed to trial. Mr. Pantoliano "gained an enormous strategic benefit from accepting

28

the Government's plea offer."  *United States v. Diaz*, No. 07-CR-003 (BSJ), 2009 WL 4496052, at *4 (S.D.N.Y. Dec. 3, 2009). "[I]n the absence of a plea agreement, the government would presumably have been free to prosecute [Mr. Pantoliano] on [the three] open counts against him[.]"  *United States v. Arteca*, 411 F.3d 315, 321 (2d Cir. 2005).  This is particularly notable as Mr. Pantoliano faced an additional § 924(c) count, to which he did not plead guilty.  If convicted of both § 924(c) counts, Mr. Pantoliano faced consecutive mandatory minimum sentences, and a far longer term of incarceration.  *See United States v. McIntosh*, 33 F. Supp. 3d 448, 450 (S.D.N.Y. 2014); *United States v. Mejia*, 545 F.3d 179, 205 (2d Cir. 2008); *see also Gomez v. United States*, No. 10-CV-01886 (CBA), 2013 WL 66080, at *7 (E.D.N.Y. Jan. 4, 2013) ("Had [petitioner] proceeded to trial, moreover, [he] risked a substantially harsher sentence.").  Mr. Pantoliano also "earned a three-level reduction from his base offense level for acceptance of responsibility - a benefit that he would have lost had he gone to trial."  *Arteca*, 411 F.3d at 321; *see also, e.g.*, *Diaz*, 2009 WL 4496052 at *4.

        The strategic benefits of pleading guilty appear even greater in light of the fact that Mr. Pantoliano has not provided any persuasive reason for doubting the strength of the Government's case against him.  *See Arteca*, 411 F.3d at 321-22. Mr. Lind affirms that the Government's case against Mr.

Pantoliano was strong, particularly with respect to his involvement in robbing gambling establishments. (Lind Aff. ¶ 19.)[7]  This is supported by the record.  The Government represented at the plea hearing that, had Mr. Pantoliano proceeded to trial, its evidence would consist of "testimony from cooperating witnesses, as well as testimony with respect to the robbery itself," that between April 2008 and September 2008, Mr. Pantoliano went into illegal card games and robbed people of the proceeds of those games, and that, during the aforementioned robberies, Mr. Pantoliano brandished a firearm. (Plea Tr. at 10:13-11:12.)  Mr. Pantoliano himself allocuted under oath that, between April 2008 and September 2008, he conspired to rob narcotics traffickers and gambling establishments in Brooklyn and Staten Island, and that he brandished a gun during the course of the conspiracy. (*Id.* at 11:13-13:14.)

Mr. Pantoliano now responds with baseless allegations of misconduct and corruption, but identifies no potentially viable defenses or any meritorious weaknesses in the Government's case against him.  "[T]he evidence against Defendant was strong, he acknowledge[d] his guilt, and it is more than reasonable to assume that he would have been found

---

[7] Portions of this evidence were previewed at the suppression hearing held. (*See* 10-cr-68, ECF No. 39, Report and Recommendations (summarizing testimony of ATF agent at suppression hearing).)

guilty and faced the same [if not far more dire] . . . consequences had he proceeded to trial." *Francis*, 2013 WL 673868, at *4 (S.D.N.Y. Feb. 25, 2013); *see also, e.g.*, *Morton v. Perez*, No. 13-CV-3985 (AT) (GWG), 2014 WL 407411, at *9 (S.D.N.Y. Feb. 4, 2014) ("[I]f [defendant] had gone to trial, [he] could have faced 25 years imprisonment on each of the robbery charges, seven years on the weapons possession charge, and four years on the bail jumping charge.  Also, all of these sentences could have been ordered to run consecutively.  Given the choice [defendant] faced, and the absence of any evidence in the record suggesting that he would have been acquitted, there is no basis on which to conclude that 'a decision to reject the plea bargain would have been rational under the circumstances.'").  In light of the above, the court cannot conclude that Mr. Pantoliano has met the high standard of *Strickland*.  His claim is denied.

Mr. Pantoliano has not established that he received ineffective assistance of counsel at pleading, and the facts – summarized above – indicate that his agreement to plead guilty was knowing and voluntary.  Consequently, the collateral attack waiver in the plea agreement remains valid and the remainder of his claims are procedurally barred.

B. Ground Four: Ineffective Assistance at Sentencing

Mr. Pantoliano argues that Mr. Katowitz, his fourth attorney, provided ineffective assistance of counsel at sentencing because he failed to bring Mr. Pantoliano's case file to court, preventing Mr. Pantoliano from presenting "mitigating evidence" contained therein.  (Pet. at 35.)   This mitigating evidence allegedly consisted of letters of support and the PSR, which Mr. Pantoliano claims reflected that there were "no injured parties," a contention rejected above.  His ineffective assistance at sentencing claim is procedurally barred by the collateral attack waiver in the plea agreement.  *Northover v. United States*, No. 11-CR-630 (KMK), 2019 WL 6173704, at *3 (S.D.N.Y. Nov. 19, 2019) ("[A] claim of ineffective assistance is waived when it relates to counsel's performance at the sentence."); *United States v. Djelevic*, 161 F.3d 104, 107 (2d Cir. 1998) ("If we were to allow a claim of ineffective assistance of counsel at sentencing as a means of circumventing plain language in a waiver agreement, the waiver of appeal provision would be rendered meaningless.").

Even if not barred, Mr. Pantoliano's claim lacks merit.  Mr. Pantoliano makes only the bare allegation that he would have received a lower sentence had he presented the evidence cited above and has not shown there was "a reasonable probability that, but for [Mr. Katowitz's alleged failure to

bring his case file to the sentencing proceeding], he would have received a less severe sentence," *Gonzalez*, 722 F.3d at 130 (2d Cir. 2013).  Indeed, Judge Johnson initially imposed a sentence of 181 months, which he reduced to 125 months only to comply with the plea agreement.  Mr. Pantoliano presents no evidence from which this court can conclude that there is any reasonable possibility that Judge Johnson would have further reduced Mr. Pantoliano's sentence after reviewing the allegedly mitigating evidence cited above.

Mr. Pantoliano further argues that his waiver of his right to counsel at sentencing was unconstitutional pursuant to *Faretta v. California*, 422 U.S. 806 (1975) because it was not "knowing and voluntary."  Any *Faretta* argument is barred both by the collateral attack waiver, and because Mr. Pantoliano failed to raise it on direct appeal and shows no cause for his failure to do so do.  *Zhang v. United States*, 506 F.3d 162, 166 (2d Cir. 2007) ("[A] claim may not be presented in a habeas petition where the petitioner failed to properly raise the claim on direct review."); *Marone v. United States*, 10 F.3d 65, 67 (2d Cir. 1993) ("[T]o raise a claim that could have been raised on direct appeal, a § 2255 petitioner must show cause for failing to raise the claim at the appropriate time and prejudice from the alleged error."); *United States v. Miller*, No. 92-CR-91 (RJD), 2010 WL 1269796, at *24 (E.D.N.Y. Mar. 30, 2010)

("[Petitioner's *Faretta*] claim is procedurally barred from consideration by this Court because it is entirely record-based but was not raised on [his] direct appeal.").[8]

C. <u>Ground Two: Alleged Financial Interest</u>

Mr. Pantoliano argues that his conviction and sentence are unconstitutional because "Respondents," without specifying

---

[8] Even if not barred, Mr. Pantoliano would not likely prevail on his *Faretta* claim.  Before granting a defendant the opportunity to proceed *pro se*, the district court "must ensure itself that the waiver of counsel is made knowingly and intelligently, which depends upon the particular facts and circumstances of the case and characteristics of the defendant." *United States v. Hausa*, 922 F.3d 129, 134 (2d Cir. 2019) (internal citations and quotation marks omitted).  Although Judge Johnson did not engage in a lengthy colloquy with Mr. Pantoliano on the record, a court need not "resort to any particular talismanic procedures in order to ensure that the defendant's Sixth Amendment rights are not violated," so long as it "ensure[s] that the defendant understood [1] that he had a choice between proceeding pro se [or] with assigned counsel, . . . [2] understood the advantages of having one trained in the law to represent him, and . . . [3] had the capacity to make an intelligent choice." *United States v. Nina*, 607 F. App'x 33, 36 (2d Cir. 2015) (internal citations and quotation marks omitted).

As the record reflects, Mr. Pantoliano's actions demonstrated all elements were satisfied: Judge Johnson repeatedly indicated to Mr. Pantoliano, as each of his four attorneys was discharged at Mr. Pantoliano's request, he could continue with counsel or proceed *pro se*; Mr. Pantoliano sparred with his various attorneys and sought to substitute his legal views for their own, despite Judge Johnson's indications that their performance was helpful; and Judge Johnson found Mr. Pantoliano competent to plead guilty, and Mr. Pantoliano rejected any attempts to secure a mental health evaluation requested by his counsel.  Moreover, Mr. Pantoliano's routine creation of conflicts with his attorneys, despite their performance, may be the functional equivalent of knowing and voluntary waiver of his right to counsel.  *See, e.g.*, *United States v. Moore*, 706 F.2d 538 (5th Cir. 1983) (finding no violation where defendant dismissed four separate court-appointed counsel following warnings similar to those here, despite no *Faretta* warnings, because defendant's "persistent, unreasonable demand for dismissal of counsel and appointment of new counsel, as [therein] discussed, [was] the functional equivalent of a knowing and voluntary waiver of counsel"); *United States v. Thomas*, 357 F.3d 357, 362-63 (3d Cir. 2004) (affirming district court's finding that the defendant waived his right to counsel after having been appointed four attorneys prior to trial, particularly since the defendant engaged in dilatory conduct and generally abusive behavior toward his lawyers, and was repeatedly warned that his refusal to cooperate with defense counsel would result in a waiver of his right to counsel).

which of the many Respondents named in this action, had a financial interest in his conviction.  Like Mr. Pantoliano's *Faretta* claim, this argument is procedurally barred both by the collateral attack waiver contained in his plea agreement and because Mr. Pantoliano failed to raise the argument on direct appeal.  *Zhang*, 506 F.3d at 166; *Marone*, 10 F.3d at 67; *Reed*, 512 U.S. at 354 (1994).[9]

Even if not barred, this claim lacks merit.  Mr. Pantoliano's alleged evidence comes in the form of citations to two Committee on Uniform Securities Identification Procedures ("CUSIP") numbers – used to identify financial instruments, including stocks of all registered U.S. and Canadian companies, commercial paper, and U.S. government and municipal bonds, *see CUSIP Number*, SEC'S & EXCH. COMM'N, https://www.sec.gov/answers/cusip.htm (last accessed April 20, 2020) – which allegedly pertain to financial instruments associated with Mr. Pantoliano's name and case numbers.  (Pet. at 21-22.)  Mr. Pantoliano makes the conclusory assertion that "it appears from the [the CUSIP numbers] that the coffers of the Respondent(s)

---

[9] Mr. Pantoliano argues that he raised this argument on rehearing "as information became available."  (*See* Pet. at 2, 6.)  Mr. Pantoliano does not specify when he reportedly first received this information, nor does raising this argument on rehearing cure Mr. Pantoliano's failure to raise this question on direct appeal prior to rehearing.  *See United States v. Quiroz*, 22 F.3d 489, 490 (2d Cir.1994) (argument raised for the first time on petition for rehearing will be deemed waived).

have profited from [his] conviction."  (*Id.* at 22.)  Even if
these instruments do exist and are related in some way to Mr.
Pantoliano and/or his case, Mr. Pantoliano draws no connection
between Respondents and these numbers.  Nor did Mr. Pantoliano
pay any fine, forfeiture, or restitution in the underlying
criminal action.  His arguments of a financial interest are
meritless and unsupported by competent evidence.

   D. <u>Ground Three: Lack of Subject Matter Jurisdiction</u>

   Mr. Pantoliano argues that his conviction and sentence
are unconstitutional, and asserts that the district court lacked
subject matter jurisdiction over his criminal action because the
locations where the crimes occurred, Brooklyn and Staten Island,
were not "ceded to the United States Government by virtue of the
Enclave Clause" of the U.S. Constitution, and were not "ceded to
the United States Government by virtue of the Property Clause."
(Pet. at 7.)  Mr. Pantoliano's argument is barred by the waiver
in his plea agreement and because it was raised and considered
on direct appeal.  *See United States v. Perea*, 129 F.3d 255, 260
(2d Cir. 1997) ("A § 2255 motion may not relitigate issues that
were raised and considered on direct appeal.").

   Even if not barred, Mr. Pantoliano's jurisdictional
challenge is plainly without merit.  Mr. Pantoliano pleaded
guilty to an indictment charging him with a federal crime.
Pursuant to the United States Constitution, this Court retains

jurisdiction over violations of federal law.  U.S. Const. Art.
III, § 2 ("The judicial power shall extend to all cases, in law
and equity, arising under . . . the laws of the United
States.").  "Contrary to [Mr. Pantoliano's] bald assertions,
Staten Island [and Brooklyn] [are] part of the State of New York
and the United States of America and lie[] within the federal
jurisdiction of the United States Court for the Eastern District
of New York."  *Garaventa v. Holder*, No. 12-CV-1741 (CBA), 2013
WL 878677, at *2 (E.D.N.Y. Mar. 8, 2013) (rejecting identical
argument); *see also* 28 U.S.C. § 112 (providing that Kings and
Richmond county fall within this district's jurisdiction).

     E. Ground Five: *Johnson* Claim

     Mr. Pantoliano last argues that his § 924(c)
conviction must be vacated pursuant to *Johnson* because
conspiracy to commit Hobbs Act robbery does not qualify as a
crime of violence so as to sustain a § 924(c) charge.  (ECF No.
24, Request for Leave to Amend.)  Were Mr. Pantoliano sentenced
today, or had Mr. Pantoliano not waived his collateral attack
rights, he could prevail.  *See United States v. Davis*, 139 S.
Ct. 2319, 2323-24 (2019); *United States v. Barrett*, 937 F.3d
126, 127 (2d Cir. 2019).  Yet, Mr. Pantoliano's claim is barred.

     "[A] defendant's 'inability to foresee [a change in
the law] does not supply a basis for failing to enforce an
appeal waiver.  On the contrary, the possibility of a favorable

change in the law after a plea is simply one of the risks that accompanies pleas and plea agreements.'" *United States v. Lee*, 523 F.3d 104, 107 (2d Cir. 2008) (quoting *United States v. Morgan*, 406 F.3d 135, 137 (2d Cir. 2005)).  As a result, the Second Circuit routinely denies collateral attacks based on *Johnson* where a petitioner pleaded guilty and waived his right to appeal or file a collateral attack.  *See, e.g.*, *Sanford*, 841 F.3d at 580 (rejecting collateral attack of sentence based on *Johnson* because of an appeal waiver); *Collier v. United States*, No. 10-CR-820 (NGG), 2019 WL 296767, at *5 (E.D.N.Y. Jan. 22, 2019) (enforcing collateral waiver to bar *Johnson* claim for § 924(c) charge); *Northover*, 2019 WL 6173704, at *4 (same).  Mr. Pantoliano's procedurally barred claim meets the same fate.[10]

---

[10] By letter dated March 2, 2017, Mr. Pantoliano moved to supplement his petition to state a sixth ground for relief, prosecutorial and agent misconduct before the grand jury.  (ECF No. 36, Motion to Supplement.)  Mr. Pantoliano failed to present this argument on direct appeal and it is, thus, procedurally barred.  *See, e.g. Feuer v. United States*, No. 07-CR-975 (WHP), 2012 WL 1319872, at *2 (S.D.N.Y. Apr. 4, 2012).  To the extent Mr. Pantoliano seeks to avoid this bar by arguing that his claim relies on new evidence – namely, the statements of one of the three cooperating witnesses that he allegedly did not identify Mr. Pantoliano to the ATF Agent, thus rendering the agent's grand jury testimony perjurious – his argument is unavailing.  As an initial matter, Mr. Pantoliano proffers only hearsay statements in an effort to contravene the agent's sworn statements before the grand jury.  Even if a cooperating witness had made the statement, it does not affect the testimony of the two other cooperating witnesses who the agent testified identified Mr. Pantoliano, and Mr. Pantoliano presents no evidence that the two cooperators did not testify to this effect.  Furthermore, Mr. Pantoliano pleaded guilty to the crimes charged, thereby "extinguish[ing] [his] ability . . . to raise a claim regarding misconduct before a grand jury." *Alston v. Ricks*, No. 01-CV-9862 (GWG), 2003 WL 42144, at *7 (S.D.N.Y. Jan. 7, 2003); *see also Mayes v. Donnelly*, No. 03-CV-417, 2009 WL 2601106, at *10 (W.D.N.Y. Aug. 21, 2009) (collecting cases).  As the proposed amendment would be futile, Mr. Pantoliano's request for leave to amend is denied.  *See, e.g.,*

## Conclusion

For the reasons stated above, Mr. Pantoliano's § 2255
petition is DENIED in its entirety.  Because Mr. Pantoliano has
not made a substantial showing of the denial of a constitutional
right, a certificate of appealability shall not issue.  28
U.S.C. § 2253(c); *Miller-El v. Cockrell*, 537 U.S. 322, 327
(2003) (discussing certificate of appealability standard); Rules
Governing Section 2254 and 2255 Cases, Rule 11 ("The district
court must issue or deny a certificate of appealability when it
enters a final order adverse to the applicant.").  The Clerk of
Court is respectfully directed to enter judgment in favor of
Respondent, and to close the case.[11]  The Government is
respectfully directed to serve Petitioner with a copy of this
Memorandum & Order and the Judgement at his last known address,
and to note service on the docket.

In addition, the court's review of the docket revealed
that several filings contain the full name and/or pictures
and/or medical information regarding Mr. Pantoliano's minor
child (ECF Nos. 1, 19, 37, 39).  Pursuant to the E-Government
Act of 2002, and corresponding guidance adopted by this court,

---

*Thaler v. United States*, 706 F. Supp. 2d 361, 373 (S.D.N.Y. 2009) (denying
leave to amend habeas petition as futile).

[11] Mr. Pantoliano's motion for judgment on the pleadings (ECF No. 31), Mr.
Pantoliano's motion to amend (ECF No. 36), and Mr. Pantoliano's request for a
restraining order and preliminary injunction (ECF No. 46) are denied.

*see* https://img.nyed.uscourts.gov/files/local_rules/
egov2002-amd8204.pdf, filings should not include such
information.  The Clerk of Court is, therefore, respectfully
directed to restrict access to the aforementioned docket entries
to case participants only, to protect the child's privacy.

**SO ORDERED.**

Dated:   May 4, 2020

/s/
_____
Hon. Kiyo A. Matsumoto
United States District Judge
